UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>20/20 TRADING COMPNAY, INC., 20/20 PRECIOUS METALS, INC., BHARAT ADATIA, SHARIEF D. MCDOWELL, AND TODD KREJCI<br><br>Defendants. | CASE NO. SACV 11-643-JST (FMOx)<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION, DISSOLVING THE STATUTORY RESTRAINING ORDER, AND TERMINATING THE TEMPORARY RECEIVER'S APPOINTMENT** |

"o"

1

## I. INTRODUCTION

Before the Court is Plaintiff the United States Commodity Futures Trading Commission's ("CFTC") motion for a preliminary injunction pursuant to 7 U.S.C. § 13a-19(a). (Doc. 2.) The CFTC bases the motion on claims three and four in the Complaint, which allege that Defendants 20/20 Precious Metals, Inc. ("20/20 Metals"), Bharat Adatia, Todd Krejci, and Sharief McDowell violated Section 19 of the Commodity Exchange Act ("the Act"), 7 U.S.C. § 23, by committing fraud in connection with certain leverage transactions and by entering into certain leverage transactions involving palladium and copper. (Compl., Doc. 1, ¶¶ 79-90.) Having considered the parties' briefs and having heard oral argument, the Court DENIES CFTC's motion for a preliminary injunction, dissolves the statutory restraining order, and terminates the temporary receiver's appointment.

## II. BACKGROUND

The Complaint alleges the following facts. 20/20 Trading Company, Inc. ("20/20 Trading") was a Nevada corporation with its principal place of business in Laguna Niguel, California, that ceased doing business in October 2009. (*Id.* ¶ 16.) 20/20 Metals is a Nevada corporation with its principal place of business in Laguna Niguel. (*Id.* ¶ 17.) Adatia was a principal, director, and the president of 20/20 Trading, and is the president and director of 20/20 Metals. (*Id.* ¶ 18.) McDowell was a principal of 20/20 Trading and is a salesperson for 20/20 Metals. (*Id.* ¶ 19.) Krejci is a salesperson for 20/20 Metals. (*Id.* ¶ 20.)

Between January 2006 and October 2009, McDowell, in her capacity as a principal and salesperson of 20/20 Trading and under Adatia's supervision, solicited prospective customers by telephone to open commodity options trading accounts with 20/20 Trading. (*Id.* ¶ 28.) McDowell allegedly misled prospective customers regarding the likelihood of profiting from trading commodity options, the risk involved in the activity, and the performance of 20/20 Trading's customers. (*Id.* ¶ 29.) Throughout this period, once

prospective customers signed on to 20/20 Trading, 20/20 Trading assisted customers in establishing a future commission merchant ("FCM") and acted as an intermediary by placing trades in the FCM accounts on behalf of its customers, earning allegedly exorbitant commissions for each trade placed in those accounts. (*Id.* ¶ 36.) McDowell also allegedly continued to mislead customers. (Id. ¶¶ 37-42.) This led to 20/20 Trading customers losing in excess of $3.8 million during this period, with approximately 63% of those losses resulting from 20/20 Trading's commissions. (*Id.* ¶ 43.) Adatia closed 20/20 Trading in October 2009. (*Id.* ¶ 45.)

Shortly after 20/20 Trading shut down, Adatia established 20/20 Metals as a business that offered and entered into transactions with customers for the purchase of gold, silver, platinum, palladium, and copper. (*Id.* ¶ 46.) 20/20 Metals solicits customers through its website, www.20-20preciousmetals.com, and third-party leads. (*Id.* ¶¶ 48 -50.) In their telephone solicitations, McDowell and Krejci informed prospective customers that (a) 20/20 Metals purchases physical metals for its customers; (b) customers receive title to those metals; (c) 20/20 Metals will arrange financing for up to 75% of the purchase price of the metals; (d) 20/20 Metals ensures that its customers' physical metals are stored in a secure depository; and (e) the customer incurs interest, storage fees, and other charges in connection with the purchase. (*Id.* ¶ 51.) The CFTC alleges that although 20/20 Metals claims to offer its customers investments in actual physical metals, most customers are purchasing metals on a leveraged basis, not taking delivery of the metals, and utilizing the transactions merely to speculate on the price of metals. (*Id.* ¶¶ 46-47.) The CFTC alleges that instead of purchasing actual metals for its customers, 20/20 Metals sends the funds to a third party, Hunter Wise Commodities, LLC ("HWC"), who then uses the funds to enter into leverage transactions in the name of 20/20 Metals. (*Id.* ¶ 56.) The CFTC alleges that 20/20 Metals does not purchase the metals, pass title to the metals to the customers, or store the metals in a secure depository. (*Id.* ¶ 60.) 20/20 Metals also allegedly does not arrange for or obtain financing for the leveraged portions of its customers' purchases. Instead, 20/20 Metals allegedly misinforms their customers that a loan has been made to

them in the amount of the difference between the total value of the metals they purchased and the funds they have deposited with 20/20 Metals, minus commissions, and then fraudulently charges customers interest on these non-existing loans and storage fees for non-existing metals. (*Id.* ¶¶ 61-63.) Since 20/20 Metal's inception in late 2009, its customers have alleged deposited over $1 million in 20/20 Metal accounts, and 20/20 Metals has taken commissions of over $400,000. (*Id.* ¶ 65.)

On April 26, 2011, the CFTC filed a Complaint (Doc. 1), a motion for a preliminary injunction (Doc. 2), and a motion for a statutory restraining order (Doc. 3) against Defendants. The Complaint alleges four claims for violation of the Act. The CFTC brings the first claim against 20/20 Trading, Adatia, and McDowell for commodity options fraud in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. (Compl. ¶¶ 66-73). The CFTC brings the second claim against 20/20 Trading and Adatia for failure to supervise in violation of 17 C.F.R. § 166.3. The events which form the basis for claims one and two occurred at 20/20 Trading between January 2006 and October 2009. (*Id.* ¶¶ 74-78.)

In contrast, claims three and four are brought against 20/20 Metals, Adatia, McDowell, and Krejci, and are based on events that occurred from late 2009 through the present at 20/20 Metals. (*Id.* ¶¶ 81, 87.) Specifically, claim three alleges that 20/20 Metals, Adatia, McDowell, and Krejci violated 7 U.S.C. § 23 and 17 C.F.R. § 31.3 by committing fraud in connection with certain leverage transactions. (*Id.* ¶¶ 79-85.) Claim four alleges that these Defendants violated 7 U.S.C. § 23 by executing certain leverage transactions involving copper and palladium. (*Id.* ¶¶ 86-90.) The motions for a preliminary injunction and statutory restraining order are based solely on claims three and four in the Complaint, which involve 20/20 Metals, not 20/20 Trading.

On April 27, 2011, the Court issued a statutory restraining order, appointed a temporary receiver, and set a hearing for CFTC's motion for a preliminary injunction. (Doc. 13.) On June 6, 2011, the Court held a hearing on the motion for preliminary injunction.

### III. LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 676 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tx v. Camenisch*, 451 U.S. 390, 395 (1981). A district court should issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376 (2008). This requires the district court to make findings of fact and conclusions of law. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007); *see LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1155 (9th Cir. 2006).

"[T]he party seeking the injunction . . . bear[s] the burden of demonstrating the various factors justifying preliminary injunctive relief . . . ." *Granny Good Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 441 (1974). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374. This "requires the plaintiff to make a showing on all four prongs." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

The Ninth Circuit employs the "serious questions" version of the "sliding scale" approach when applying the four-element *Winter* test. *Id.* at 1134. "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

## IV. MOTION TO STRIKE DECLARATIONS

On May 23, 2011, the CFTC filed a motion to strike declarations submitted by Defendants' expert Philip A. Feigin and Defendant Adatia. (Doc. 56.) Because the CFTC did not file the motion 28 days before hearing date, the Court treats the motion as an objection to such evidence. *See* C.D. Cal. R. 6-1 ("The notice of motion shall be filed with the Clerk not later than twenty-eight (28) days before the date set for hearing . . . ."). The CFTC argues that the Court should strike the declarations because they contain improper legal opinions and conclusions. (*Id.* at 2.) The Court's Order does not rely on the substance of either declaration, and therefore does not rely on any alleged legal conclusions or opinions made by either. Thus, the Court DENIES the CFTC's objection as moot.

## V. DISCUSSION

Defendants argue that the Court should not issue a preliminary injunction, and rather should dissolve the existing statutory restraining order, because the CFTC does not have jurisdiction over claims three and four in the Complaint. Defendants mistakenly argue that because the CFTC does not have jurisdiction over claims three and four, the Court does not have subject matter jurisdiction over the claims. (Defs.' Opp. at 4); *see CFTC v. White Pine Trust Corp.*, 574 F.3d 1219, 1222 n.2 (9th Cir. 2009) (noting that defendant confused an attack on the CFTC's jurisdiction with the district court's subject matter jurisdiction). The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the CFTC brings the claims pursuant to a federal law, the Commodities Exchange Act. *Id.* Nonetheless, Defendants' argument that the CFTC lacks jurisdiction over claims three and four is "akin to a claim that there is no cause of action provided by the statute," which on a motion for preliminary injunction can be read as an argument going to the likelihood of success on the merits. *Id.* The CFTC counters that it has jurisdiction to bring claims three and four under 7 U.S.C. § 23 because the types of contracts 20/20 Metal was entering into with its customers "are precisely the type of

transactions identified in Section 19." (Pl.'s Reply at 12.) Thus, the question before the Court is whether the CFTC has jurisdiction over claims three and four.

### A. Injunctive Relief Under the Act

Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), grants the CFTC authority to seek and the Court to grant injunctive relief:

> Whenever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions . . . .

7 U.S.C. § 13a-1(a). However, "[s]tanding alone, these subsections grant no jurisdiction; the CFTC must allege and . . . show a violation of the Act or of its regulations." *White Pine Trust*, 574 F.3d at 1223. Because the CFTC brings the motion for preliminary injunction based solely on alleged violations of 7 U.S.C. § 23, the Court must determine whether the alleged "leverage transactions" in claims three and four fall under the CFTC's jurisdiction under that provision.

### B. The CFTC's Jurisdiction Under 7 U.S.C. § 23

The jurisdiction of the CFTC derives from section 2 of the Act. *White Pine Trust*, 574 F.3d at 1223 (when determining the CFTC's jurisdiction, "all roads lead back to section 2 of the Act"). Section 2 establishes that the CFTC shall have exclusive

jurisdiction over "transactions subject to regulation by the Commission pursuant to section 23 of this title." 7 U.S.C. § 2(a)(1)(A). 7 U.S.C. § 23(a), in turn, provides:

> Except as authorized under subsection (b) of this section, no person shall offer to enter into, enter into, or confirm the execution of, any transaction for the delivery of any commodity under a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or under any contract, account, arrangement, scheme, or device that the Commission determines serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract.

7 U.S.C. § 23(a). Under 7 U.S.C. § 23(b),

> Subject to paragraph (2), no person shall offer to enter into, enter into, or confirm the execution of, any transaction for the delivery of silver bullion, gold bullion, bulk silver coins, bulk gold coins, or platinum under a standardized contract described in subsection (a) of this section, contrary to the terms of any rule, regulation, or order that the Commission shall prescribe, which may include terms designed to ensure the financial solvency of the transaction or prevent manipulation or fraud.

7 U.S.C. § 23(b)(1). The CFTC contends that the contracts 20/20 Metal entered into with its customers were "Section 19" contracts under 7 U.S.C. § 23. (Pl.'s Mot. at 6-7; Pl.'s Reply at 3-5, 12-20.) Defendants argue that the contracts in question were not "leverage contracts," as defined by 17 C.F.R. § 31.4(w) ("Regulation 31.4(w)"), and thus do not fall under 7 U.S.C. § 23. The CFTC argues that leverage contracts are but one type of standardized contract encompassed by 7 U.S.C. § 23 and that the "broad" grant of

jurisdiction under 7 U.S.C. § 23 is not restricted by Regulation 31.4(w)'s definition of a leverage contract.[1] (Pl.'s Reply 3, 6-7.) Thus, the Court must decide whether the CFTC's jurisdiction under 7 U.S.C. § 23 is contingent on Regulation 31.4(w)'s definition of "leverage contracts."

C. Section 19 Contracts vs. Leverage Contracts

The plain language of 7 U.S.C. § 23(a) restricts the CFTC's jurisdiction under that section to "a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or under any contract, account, arrangement, scheme, or device that the Commission determines serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract." 7 U.S.C. § 23(a). "In 1984, the [CFTC] issued comprehensive regulations to govern leverage transactions," and in doing so, "set forth a narrow definition of a leverage contract" in Regulation 31.4(w). *First Nat. Monetary Corp. v. CFTC*, 860 F.2d 654, 658 (6th Cir. 1988); *see* 17 C.F.R. §§ 31.1 – 31.26. Regulation 31.4(w) defines a leverage contract as "a contract, standardized as to terms and conditions, for the long-term (ten years or longer) purchase ('long leverage

---

[1] The CFTC argues that Defendants have failed to offer authorities that establish that the CFTC lacks jurisdiction over said contracts. (Pl.'s Reply at 8-12.) Because it is the CFTC's burden to establish jurisdiction to prosecute its claims, this argument is unavailing. The CFTC also devotes a substantial part of its reply brief to Defendants' alleged fraud in violation of 17 C.F.R. § 31.3. (*Id.* at 4-5, 17-20.) Whether Defendants committed fraud, however, is irrelevant to the preliminary question of whether the CFTC has jurisdiction over the contracts and transactions in question. *See CFTC v. Zelener*, 373 F.3d 861,867 (7th Cir. 2004) ("The Commission's principal substantive contention is that [defendant] deceived its clients. That could form the basis of a mail-fraud or wire-fraud prosecution, a civil or criminal action under RICO, or fraud litigation in state court. Consumers or state attorneys general could involve consumer-protection laws as well. It is unnecessary to classify the transaction as future contracts in order to provide remedies for deceit. Why stretch the Commodity Futures Act – with resulting uncertainty, litigation costs, and potentially unhappy consequences for other economic arrangements that may be swept into a regulatory system not designed for them – when other remedies are ready to hand?").

9

contract') or sale ('short leverage contract') by a leverage customer of a leverage commodity which provides for":

>(1) Participation by the leverage transaction merchant as a principal in each leverage transaction;
>
>(2) Initial and maintenance margin payments by the leverage customer;
>
>(3) Periodic payment by the leverage customer or accrual by the leverage transaction merchant of a variable carrying charge or fee on the unpaid balance of a long leverage contract, and periodic payment or crediting by the leverage transaction merchant to the leverage customer of a variable carrying charge or fee on the initial value of the contract plus any margin deposits made by the leverage customer in connection with a short leverage contract;
>
>(4) Delivery of a commodity in an amount and form which can be readily purchased and sold in normal commercial or retail channels;
>
>(5) Delivery of the leverage commodity after satisfaction of the balance due on the contract; and
>
>(6) Determination of the contract purchase and repurchase, or sale and resale prices by the leverage transaction merchant.

17 C.F.R. § 31.4(w).

Recognizing that 20/20 Metals' contracts do not qualify as leverage contracts, the CFTC argues that Regulation 31.4(w) is "irrelevant" and that its jurisdiction under 7 U.S.C. § 23 encompasses more than leverage contracts. Put simply, the CFTC argues that 20/20 Metals' contracts qualify as Section 19 contracts, but are not leverage contracts. Throughout its briefs, the CFTC uses "Section 19 contracts" broadly to mean those transactions falling under 7 U.S.C. § 23. This broad terminology, however, has not been adopted by the courts. Indeed, only one court refers to transactions falling under 7 U.S.C. § 23 as Section 19 contracts, and that case was decided before the CFTC set forth the definition of leverage contract under Regulation 31.4(w) in 1984. *See Breyer v. First Nat.*

1  *Monetary Corp.*, 548 F. Supp. 955 (D.N.J 1982).  Even then, the court in *Breyer* defines a
2  Section 19 contract as "a standardized contract commonly known in the trade as a . . .
3  leverage account or leverage contract."  *Id.* at 964 (quoting 7 U.S.C. § 23(a)).  Instead,
4  courts generally have used the term leverage contract to encompass 7 U.S.C. § 23(a).  *See,*
5  *e.g., Galvin v. First Nat. Monetary Corp.*, 624 F. Supp. 154, 156 (E.D.N.Y. 1985) (noting
6  that "[a] leverage contract . . . is defined by Congress, albeit circuitously, as" the definition
7  found in 7 U.S.C. section 23(a)).

Furthermore, the CFTC fails to explain how Section 19 contracts could be anything but leverage contracts or the functional equivalent.  The plain language of 7 U.S.C. § 23 uses margin account, margin contract, leverage account, or leverage contract synonymously to define the type of standardized contract governed by the statute.  The CFTC does not argue that 20/20 Metals' contracts were margin contracts or accounts, as they are the equivalent to leverage contracts.  Any other type of "contract, account, arrangement, scheme, or device" that "serves the same function or functions *as such a* standardized contract, or is marketed or managed in substantially the same manner *as such a* standardized contract," must be the functional equivalent of "such a standardized contract," i.e., a leverage contract.  7 U.S.C. § 23(a) (emphasis added).  Instead, the CFTC relies on language from a 1978 Senate Report, S. Rep. No. 95-850, that accompanied the passing of the Futures Trading Act of 1978, Pub. L. No. 95-405, which instituted Section 19 of the Act, to argue that 20/20 Metals transactions fall under 7 U.S.C. § 23.  (*See* Pl.'s Mot. at 6-7 nn. 2-3.)  This argument fails for two reasons.  First, Senate Report 95-850 attempted to define leverage contract, the very term from which the CFTC attempts to distance itself.  The Report noted: "Generally, the *leverage contract* currently in use in an agreement for the purchase or sale of a contract for the delivery at a later date of a specified commodity in a standard unit and quality, or the close-out of the contract by an offsetting transaction."  S. Rep. No. 95-850 at 25 (1978) (emphasis added).  The Report then stated that the "principal characteristics of the contract include":

   (1) Standard units, quality, and terms and conditions;

  (2) Payment and maintenance or 'margin';

  (3) Close-out by an offsetting transaction or by delivery, after payment in full; and

  (4) No right or interest in a specific lot of the commodity.

*Id.* With the CFTC formally defining leverage contract in Regulation 31.4(w) six years after Senate Report 95-850, Senate Report 95-850's definition, if ever controlling, was superseded. Second, no other court has utilized the characteristics in Senate Report 95-850 to find that a contract or transaction fell under the scope of 7 U.S.C. § 23. Indeed, the only case that the CFTC points to in support of this argument, *Arizona v. Smythe-Wheatley, Ltd.*, Civ. No. 84-243 (D. Ariz. Feb. 17, 1984 and Dec. 15, 1987), addressed claims for "leverage contracts" and utilized the definition in Regulation 31.4(w). (*See* Appx. Pl.'s Mem., Doc. 5, at 294, 333-334.)

  Moreover, in 1984, the CFTC adopted interim final rules in connection with its regulation of leverage transactions under 7 U.S.C. § 23 and its defining leverage contract in Rule 31.4(w). *See* 49 Fed. Reg. 5498 (1984); *CFTC v. P.I.E., Inc.*, 853 F.2d 721, 724 (9th Cir. 1988) (relying on 49 Federal Regulation 5498 in interpreting the Act); *In re Bybee*, 945 F.2d 309, 314-15 (9th Cir. 1991) (instructing that when a court interprets and applies the Act, it should give "great deference to the Commission's interpretation" (quoting *P.I.E.*, 853 F.2d at 724)). In those rules, the CFTC stated that by defining leverage contract in Regulation 31.4(w), the CFTC had "exercised its authority to specify the standardized contracts that Congress expected to be regulated under Section 19 of the Act." 49 Fed. Reg. at 5498. The CFTC delineated that "those transactions that do not meet the Commission's definition of a leverage contract are not within the Commission's regulatory jurisdiction under Section 19 of the Act . . . ." *Id.* "This 'bright line' distinction between transactions subject to exclusive Commission jurisdiction under Section 19 and those not subject to Commission regulation thereunder is one of the salutary effects of the comprehensive definition adopted by the Commission." *Id.* In addition, on August 6, 1985, the CFTC issued Interpretative Letter No. 85-2 which contemplated whether certain transactions involving the purchase and sale of precious metals qualified as leverage

contracts under 7 U.S.C. § 23 or futures contracts under 7 U.S.C. § 6(a) and were therefore subject to regulation under the Act. (*Bank Activities Involving the Sale of Precious Metals*, Comm. Fut. L. Rep. (CCH) ¶ 22,673 (CFTC Aug. 6, 1985); *see* Feigin Decl., Doc. 32, ¶ Exh. E at 1-2.)[2] As the CFTC noted: "In analyzing whether these transactions are subject to regulation under the Commodity Exchange Act, it is necessary to determine whether the transactions may be either leverage contracts [or] transactions involving contracts of sale of a commodity for future delivery within the meaning of the Act and applicable Commission regulations." (*Id.* at 2.) The transactions at issue in that opinion letter were strikingly similar to those in this case: dealers would purchase precious metals from a bank, the bank would either deliver the metals to the dealer or segregate them in holding vaults, the dealer would resell the metals to retail customers in exchange for full payments or payments pursuant to a financing agreement that were completed within two to seven business days, and the dealer would direct the bank to transfer title of the metals to the customers. (*Id.* at 1.) In the CFTC's opinion, the transactions did not qualify as leverage contracts, and therefore did not fall under 7 U.S.C. § 23, because they were not ten years or more in duration as required by Regulation 31.4(w). (*Id.*) Thus, from the plain language of 7 U.S.C. § 23, the rules set forth by the CFTC in connection with promulgating the regulatory scheme that governs the statute, and an opinion[3] issued by the CFTC when it applied the statute to similar facts as arise here, it is clear that leverage contracts constitute the exclusive type of transactions governed by 7 U.S.C. § 23.

---

[2] Defendants state in their opposition brief that Interpretative Letter No. 85-2 (August 6, 1985) is "attached hereto as Exhibit H." As the Court noted at the June 6, 2011 hearing, Defendants did not attach to its opposition brief an Exhibit H, nor Exhibits A-G or J. (See, for example, Defendants' opposition brief on page 14 citing to "Exhibit J.") Instead, Defendants attached the exhibits to declarations submitted by Defendant Adatia and their expert witness Phillip Feigin, with different exhibit letters and numbers than those referenced in the opposition brief. Interpretative Letter No. 85-2 appears as Exhibit E to Feigin's declaration.

[3] In Interpretative Letter No. 85-2, the CFTC states that "the analysis set forth above is not necessarily that of the Commission and concerns only the applicability of the Commodity Exchange Act . . . to the transactions you have described . . . ." *Bank Activities Involving the Sale of Precious Metals*, Comm. Fut. L. Rep. (CCH) ¶ 22,673 at 4 (CFTC Aug. 6, 1985).

D.  20/20 Metals' Contracts Are Not Leverage Contracts and A Preliminary Injunction Is Not Proper

The CFTC has failed to provide any evidence that the 20/20 Metals' contracts qualify as leverage contracts. As noted above, the CFTC argues that the definition of leverage contract in Regulation 31.4(w) is irrelevant. (Pl.'s Reply at 6-7.) In fact, the CFTC conceded at oral argument that, if Section 19 contracts are nothing more than leverage contracts as defined by Rule 31.4(w), they lack jurisdiction over claims three and four.[4] Nonetheless, the Court notes that there is no evidence that the contracts in question were standardized, that the contracts were for longer than 10 years, or that customers were required to maintain margin payments. For example, on the issue of duration, Defendants maintain that the maximum term of the contracts in question was for four years, and have provided declarations from customers attesting to this fact. (*See, e.g.*, Colacchio Decl., Doc. 37, ¶ 7; Engle Decl., Doc. 38, ¶ 7; Kavusak Decl., Doc. 39, ¶ 7.) The Ninth Circuit has held that a contract with a duration of less than ten years does not qualify as a leverage contract. *In re Bybee*, 945 F.2d at 312 n.3 ("Under the Commission's interpretation of the Commodity Exchange Act, there can be no such thing as a leverage contract with a duration of less than ten years." (quoting *P.I.E.*, 853 F.2d at 724)); *P.I.E.*, 853 F.2d at 724 ("In 1984, the Commission determined that one definitional requirement of a leveraged contract was that the contract must be for a duration of ten or more years."); *see First National*, 860 F.2d at 658 ("[Plaintiff's] 'cash forward' contracts would not constitute leverage contracts under these regulations because, *inter alia*, they fail to satisfy the durational requirement (ten years or longer) . . . ."); *see also Chang Ming Li v. Gain Capital Grp., LLC*, 2011 CFTC Lexis 15, at *12 (Feb. 8, 2011) ("Although not readily apparent from its language, it suffices to note that Section 19's regulatory jurisdiction is

---

[4] The CFTC devotes three sentences in its reply brief to the argument that Defendants' transactions in palladium and copper are *per se* violations of Section 19(b). (Pl.'s Reply at 21-22.) There is no basis for this argument as the transactions must still qualify as leverage contracts to fall under the jurisdiction of 7 U.S.C. § 23.

limited to a narrowly defined set of specifically conditioned contracts of ten years or longer.").

The Ninth Circuit came to an instructive conclusion when addressing a similar situation in *P.I.E.* 853 F.2d at 723. The court in *P.I.E.* had to decide whether certain precious metals contracts were futures contracts or leverage contracts:

> A. Futures contract or leverage contract
>
> [Defendant's] contracts provided a means for investors to speculate in the precious metals market. Customers dealt directly with [defendant], choosing a type and quantity of metal and then deciding whether delivery would be deferred for 90, 180, or 360 days. [Defendant] set the price by reference to the current market price of the metal for immediate delivery, plus a 3% commission and a surcharge. Customers paid a 15% deposit up front and made margin payments at [defendant's] behest if the price of the metal declined during the term of the contract. Customers rarely took delivery of the metal. Instead they sold their rights to the metal back to [defendant], which then settled the customers' respective accounts.
>
> [Defendant's] contracts can only be classified in one of two ways: they are either futures contracts or *leverage contracts*.

*Id.* at 723. The court in *P.I.E.* found that the contracts in question were not leverage contracts because they did not satisfy the ten-year durational requirement under Regulation 31.4(w). *Id.* at 724. In this case, the transactions underlying claims three and four are not ten years or more in duration and do not qualify as leverage contracts, and therefore leverage transactions, under 7 U.S.C. § 23. Thus, the CFTC lacks jurisdiction over claims three and four and, as a result, cannot show a likelihood of success or raise serious questions as to the merits of those claims to warrant a preliminary injunction.

## VI. CONCLUSION

Accordingly, the Court DENIES the motion for a preliminary injunction, dissolves the statutory restraining order, and terminates immediately the temporary receiver's appointment. The Court orders the temporary receiver to return promptly any assets or property frozen or seized pursuant to the statutory restraining order.

DATED: June 7, 2011

**JOSEPHINE STATON TUCKER**
JOSEPHINE STATON TUCKER
UNITED STATES DISTRICT JUDGE